**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO. 11-191** |
| | : | |
| v. | : | |
| | : | |
| **ANDREW CHRONISTER** | : | |

**MEMORANDUM OPINION**

**Savage, J.**                                                                                                      **March 16, 2023**

Moving for a reduction of his sentence under the compassionate release statute, 18 U.S.C. § 3582(c)(1)(A), Andrew Chronister, a prisoner at USP Terre Haute, contends that the First Step Act's revisions to the stacking penalties in 18 U.S.C. § 924(c) reducing the penalties for successive Section 924(c) offenses warrant a reduction of his sentence.[1] Chronister cites two other reasons he contends are extraordinary and compelling. First, he was incarcerated in state prison nearly two years longer than his maximum sentence due to a clerical error.[2] Second, his physical and mental health needs, coupled with his significant rehabilitation efforts, warrant compassionate release.[3]

---

[1] Def. Andrew Chronister's Mem. of Law in Supp. of His Mot. for Reduction of Sentence Under 18 U.S.C. § 3582(c)(1)(A)(i) (Compassionate Release) at 1, ECF No. 71 ["Def.'s Compassionate Release Mem."]. Chronister filed a *pro se* motion for a compassionate release. The government filed a response and Chronister filed a reply. Then counsel entered his appearance on Chronister's behalf. We ordered Chronister to file a counseled motion for compassionate release. He did. The government filed a supplemental response and Chronister filed a counseled reply.

[2] *Id.* at 5–6. On November 29, 2011, shortly after receiving his federal sentence in this case, Chronister was sentenced for violation of probation in Chester County. He was sentenced to 6-12 years in state prison, on top of his 32-year federal sentence, for violating his probation by committing the robberies. Chronister filed a *pro se* post-sentence motion to modify the violation of probation sentence based on abuse of discretion by the judge. He was informed that the motion was denied on a timing technicality. But, on January 18, 2012, his motion was granted and his VOP sentence was modified to 2-4 years' incarceration. Chronister was not informed of this until five years later in 2017. As a result, he was denied the opportunity to be heard on his parole eligibility. If he had been granted parole, he would have been able to resume serving his federal sentence in 2013 instead of 2017.

[3] *Id.* at 1.

The government counters that a change in the law does not provide a ground for compassionate release.  It contends that Section 403 of the First Step Act does not apply retroactively, citing the provision stating that the change in the stacking penalties only applies to defendants sentenced after the statute's enactment.[4]  It argues that a district court has no authority to define what constitutes an extraordinary and compelling reason for compassionate release.  The government adds that the Bureau of Prisons ("BOP") adjusted his time-served calculation to include the time he spent in state prison beyond his four-year maximum sentence.[5]  It also contends that Chronister is a 35-year-old man (now 37-year-old man) in excellent health with no mental health conditions whose rehabilitation efforts were expected, not extraordinary.[6]

In November 2009, Chronister and a co-defendant committed five armed robberies in less than twenty-four hours.[7]  He pled guilty to one count of conspiracy and five counts of Hobbs Act robbery, two counts for violation of Section 924(c), two counts of possession of a stolen firearm in violation of Section 922(j), and two counts of possession of a firearm by a convicted felon in violation of Section 922(g)(1).[8]  The government recommended a minimum sentence of 494 months' imprisonment.[9]  Upon application of the stacking penalties under Section 924(c) in place at the time of his sentencing, Chronister was

---

[4] Government's Resp. in Opp'n to Def.'s Mot. to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i), or in the Alternative Req. for a Stay at 6–8, ECF No. 65 ["Govt.'s Resp."]; Government's Suppl. Resp. in Opp'n to Def.'s Mot. to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at 5, 7–8, ECF No. 73 ["Govt.'s Suppl. Resp."].

[5] Govt.'s Suppl. Resp. at 8.

[6] *Id.* at 9, 11, 16.

[7] Govt.'s Resp. at 2; Def.'s Compassionate Release Mem. at 4.

[8] Govt.'s Resp. at 2–3; Def.'s Compassionate Release Mem. at 4.

[9] Def.'s Compassionate Release Mem. at 4–5.

sentenced to 84 months on the first 924(c) count, 300 months on the second 924(c) count, and one day on all remaining counts.[10] His aggregate sentence was thirty-two years and one day.[11] He has served approximately 90 months and has credit for good conduct time of ten months.[12] His minimum release date is November 8, 2042.[13] He has had five disciplinary infractions in prison—two in 2011 for giving and/or accepting money without authorization; one in 2017 for assault without serious injury; one in 2018 for possessing an unauthorized item; and one in 2019 for use of alcohol.[14]

After considering all the factors set forth in 18 U.S.C. § 3553(a), we conclude that Chronister has not presented an extraordinary and compelling reason warranting a sentence reduction under the compassionate release statute. Therefore, we shall deny his motion.

## The Compassionate Release Statute

*The Historical Statutory Framework*

A court may reduce a defendant's sentence if it finds that extraordinary and compelling reasons warrant a reduction and "a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). Before ordering the release of a prisoner, the court must determine that he is not a danger to the safety of others or the community. 18 U.S.C. § 3142(g).

---

[10] *Id.* at 5.; Govt.'s Resp. at 3.

[11] Govt.'s Resp. at 3; Def.'s Compassionate Release Mem. at 4–5.

[12] Govt.'s Suppl. Resp. at 8.

[13] Govt.'s Resp. at 3.

[14] Andrew Chronister, Inmate Discipline Data, Chronological Disciplinary Record, at 1–2, ECF No. 71-22 (attached as Ex. R to Def.'s Compassionate Release Mem.) ["Chronister Discipline R."].

Congress did not define what constitutes an extraordinary and compelling reason, leaving it to the Sentencing Commission to do so. In its policy statement and commentary addressing Section 3582(c)(1)(A), the Sentencing Commission set forth three specific extraordinary and compelling reasons: medical, age and family circumstances. U.S. Sentencing Guidelines Manual § 1B1.13, cmt. n. 1. (U.S. Sentencing Comm'n 2021). Application Notes 1(A) through 1(C) detail these qualifying grounds. None apply here.

Making it clear that these were not the only reasons that may be considered extraordinary and compelling, the Sentencing Commission added an "other reasons" category that provides a reduction may be warranted by an "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S. Sentencing Guidelines Manual § 1B1.13, cmt. n. 1(D) (U.S. Sentencing Comm'n 2021). At the same time, it delegated the Bureau of Prisons ("BOP") Director to define what other reasons qualified under subdivision 1(D). *Id*.

In exercising its delegated authority, the BOP issued Program Statement 5050.49 setting forth its criteria for compassionate release.[15] The Program Statement included criteria for granting requests based on medical, age and family circumstances. It also listed factors to be considered for all requests.[16] After passage of the First Step Act (FSA), the BOP amended the Program Statement outlining the circumstances that it deemed

---

[15] U.S. Department of Justice, Federal Bureau of Prisons, Program Statement 5050.49, CN-1 (March 25, 2015), available at https://www.bop.gov/policy/progstat/5050_049_CN-1.pdf.

[16] *Id*. at 3-10. Similar to the Section 3553(a) factors, these factors include the nature and circumstances of the offense, the defendant's criminal history, comments from victims, unresolved detainers, supervised release violations, institutional adjustments, disciplinary infractions, the defendant's personal history derived from the Pre-Sentence Report, the length of the defendant's sentence and the amount of time served, the defendant's current age, the defendant's age at the time of the offense and sentencing, any release plans and whether release minimizes the severity of the offense. *Id*. at 10.

4

may justify relief.[17] However, those circumstances were limited to the same bases identified by the Sentencing Commission – medical, age and family circumstances. Significantly, despite having been given the authority to do so, the BOP has not identified any other reasons that support compassionate release.

Until Congress amended the compassionate release statute in the FSA, the BOP had the exclusive authority to move for a sentence reduction.[18] With that authority came the sole responsibility for determining what reasons other than medical condition, age, and family circumstances qualified as extraordinary and compelling. If the BOP did not consider a defendant's reason extraordinary and compelling and did not file a motion, the defendant had no recourse to the courts.[19] Consequently, there was no way to discern what reason, other than the enumerated ones, constituted an extraordinary and compelling reason.

The process changed when Congress passed the FSA in December 2018. Congress displaced the BOP as the exclusive gatekeeper of motions for sentence reductions. Now, a defendant, after exhausting administrative remedies, may move for a reduction under 18 U.S.C. § 3582(c)(1)(A).

---

[17] U.S. Department of Justice, Federal Bureau of Prisons, Program Statement 5050.50 (Jan. 17, 2019), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. These changes include requiring inmates be informed of the availability and process for sentence reductions, modifications to the definition of "terminally ill," requiring notice and assistance for terminally ill inmates, requiring requests for terminally ill inmates be processed within 14 days, requiring notice and assistance for debilitated offenders and specifying that inmates may file motions directly in court after exhausting administrative remedies or 30 days from the receipt of the request by the warden. *Id*. at 3.

[18] "How the First Step Act Changed Federal Compassionate Release," Compassionate Release: A Project by Brandon Sample, Attorney at Law (2020), https://compassionaterelease.com/first-step-act-compassionate-release/.

[19] *Id*.

Congress changed the process in reaction to the BOP's inconsistent and infrequent use of the compassionate release mechanism. The BOP had filed few motions.[20] From 1984 to 2013, the BOP filed approximately 24 motions annually.[21] From 2013 to 2017, of the 5,400 applications for compassionate release, the BOP approved only six percent.[22] During that period, 266 people who had requested compassionate release died while awaiting the BOP's determination to file motions on their behalf.[23] The Inspector General's report finding that the BOP rarely moved for compassionate release under its own policies led the Sentencing Commission to amend its policy to encourage the BOP to use the mechanism more frequently. *See* "U.S. Sentencing Guidelines Manual § 1B1.13 (Policy Statement) – Compassionate Release," (U.S. Sentencing Comm'n 2016),https://www.ussc.gov/sites/default/files/elearning/2016-guideline-amendments/story_content/external_files/Comp%20Release.pdf (announcing the broadening of eligibility criteria for compassionate release to expand the pool of candidates).

To exhaust administrative remedies, a defendant must first present his request for compassionate release to the warden. After 30 days of submitting the request, the defendant may move for compassionate release in the district court if the warden has denied the request or has not acted.[24] 18 U.S.C. § 3582(c)(1)(A); *United States v. Raia*, 954 F.3d 594, 595–96 (3d Cir. 2020).

---

[20] *United States v. Redd*, 444 F. Supp. 3d 717, 725 (E.D. Va. 2020) ("The First Step [Act] was passed against the backdrop of a documented infrequency with which the BOP filed motions for a sentence reduction on behalf of defendants.").

[21] *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice).

[22] "How the First Step Act Changed Federal Compassionate Release," *supra* note 18.

[23] *Id*.

[24] *Id.*

Chronister has exhausted administrative remedies. He filed a written request with the warden on September 2, 2020.[25] More than 30 days have passed since the warden received Chronister's request. Therefore, we now consider his motion.

*Change to Section 924(c) Stacking Penalties*

Chronister was sentenced to a total prison term of 384 months and one day. The sentence was driven by the stacking of the 924(c) convictions. He was sentenced to 84 months for the first section 924(c) violation and 300 months for the second. He was sentenced to one day imprisonment on each remaining count. When he was sentenced in 2011, the statutory minimums were seven years on the first Section 924(c) count for possession of a firearm in furtherance of a crime of violence and a consecutive twenty-five years for the second Section 924(c) count. If he were sentenced today, his total term would be 168 months and he would be released in 2035. We are mindful of this disparity.

We previously held that when taken into consideration with the Section 3553(a) factors in the particular case, the disparity in sentences resulting from the FSA's amendment of the Section 924(c) stacking provision alone may constitute an extraordinary and compelling reason under Section 3582.[26] We also concluded that a condition, such as health, age or family circumstances, which itself does not rise to the level of extraordinary and compelling, when considered in combination with the disparity between the sentence the defendant received and the sentence he would have received under the FSA, may warrant a sentence reduction.[27]

---

[25] Def.'s Compassionate Release Mem. at 7.

[26] *United States v. Avery*, No. 04-243-01, 2021 WL 949482, at *6 (E.D. Pa. Mar. 12, 2021); *United States v. Randall*, No. 08-8, 2021 WL 922077, at *6 (E.D. Pa. Mar. 11, 2021).

[27] *Avery*, 2021 WL 949482, at *6; *Randall*, 2021 WL 922077, at *6.

7

Since then, the Third Circuit has ruled otherwise in *United States v. Andrews*, 12 F.4th 255 (3d. Cir. 2021). In *Andrews*, the Third Circuit ruled that "[t]he nonretroactive changes to the § 924(c) mandatory minimums . . . cannot be a basis for compassionate release." *Id.* at 261. Nor can the length of a lawfully imposed sentence.[28] *Id.* at 260–61. Thus, the disparity between the sentence Chronister received and what he would have received as a result of the change to the Section 924(c) stacking penalties is not an extraordinary and compelling reason warranting release.

### *State Prison Sentence and Parole Eligibility*

Next, we must determine whether Chronister's incarceration in state prison for two years longer than his maximum sentence constitutes an extraordinary and compelling reason. It does not. Indeed, Chronister admits that the BOP adjusted his time-served calculation to include the time he spent in state prison beyond the maximum sentence.[29]

Chronister's claim that he was denied the opportunity to be heard on his parole in state prison eligibility does not provide a basis for compassionate release. On September 27, 2011, Chronister was sentenced on the federal charges here. He was immediately remanded to the custody of the United States Marshal.

Two months later, on November 29, 2011, Chronister was sentenced to six to twelve years in state court for violation of probation related to the instant robberies. He filed a *pro se* motion to modify the sentenced based on abuse of discretion by the state judge. Although he was informed his motion was denied on a timing technicality, it was

---

[28] At the same time, the Third Circuit stated that "[i]f a prisoner successfully shows extraordinary and compelling circumstances, the current sentencing landscape may be a legitimate consideration for courts at the next step of the analysis when they weigh the § 3553(a) factors." *Andrews*, 12 F.4th at 262 (citations omitted).

[29] Def.'s Compassionate Release Mem. at 7; Govt.'s Suppl. Resp. at 8.

8

ultimately granted in early 2012.  Chronister's sentence was modified to two to four years state incarceration.[30]

Chronister began his state sentence on January 3, 2012.  Under his initial state sentence, he became eligible for parole in 2017.  In preparation for his parole hearing, Chronister contacted the Chester County Court of Common Pleas to obtain his violation of parole sentencing paperwork.  Upon review of the paperwork, Chronister discovered that his motion for modification had been granted.  Under his corrected sentence, he should have been released in 2015.  He was not released to federal authorities until July 17, 2017.  At that point, he resumed serving his federal sentence.

Although under his corrected sentence Chronister was eligible for parole on November 29, 2013, he did not learn of his eligibility until two years later.  As a result, he was not afforded the opportunity to apply for parole.  If he had the opportunity to appear before the Pennsylvania Board of Parole, he may have been granted two years' parole, which would have allowed him to resume serving his federal sentence in 2013 instead of in 2017.  Had he resumed serving his federal sentence in 2013, he would have had an additional two years of time served towards his current federal sentence.[31]

The BOP adjusted Chronister's sentence to reflect a portion of the time he spent in state custody.  Chronister received credit towards his sentence from the time of arrest on November 12, 2009 until he began serving his state sentence on January 3, 2012.  The BOP also granted Chronister's request to include the time he spent in state prison from November 30, 2015 to July 16, 2017 towards his federal sentence.  Because the

---

[30] Def.'s Compassionate Release Mem. at 5–7, 14–16.

[31] *Id.*

BOP adjusted Chronister's time-served calculation to include the time he spent in state prison beyond his four-year maximum sentence, we find that his incarceration in state prison for two years longer than his maximum sentence does not constitute an extraordinary and compelling reason.

*Health*

We now address Chronister's health and COVID-19 claims. Chronister contends that his mental health and inadequate medical treatment while incarcerated are extraordinary and compelling reasons.

Chronister is 37 years old.[32] His prison medical records indicate that he had hepatitis C, which has resolved.[33] He takes no regular medication and has no chronic conditions.[34] He has a self-reported history of depressive disorder and bipolar disorder. He has participated in inpatient and outpatient treatment programs.[35] His BOP medical records indicate that his depressive disorder is in remission.[36] There is no mention of bipolar disorder in his medical records. Nor is there any mention of manic or depressive episodes consistent with bipolar disorder.

Chronister claims that he is not receiving appropriate mental health treatment in prison. He recognizes that he needs support from mental health professionals to manage his bipolar disorder, depression, alcoholism, and substance abuse.[37] But, he has had

---

[32] *Id.* at 2.

[33] Chronister's Bureau of Prisons Medical Records at 28, ECF No. 74 (attached as Ex. A to Govt.'s Suppl. Resp.) ["BOP Medical R."].

[34] *See generally id.*

[35] Revised Presentence Investigation Report ¶¶ 131–36.

[36] BOP Medical R. at 28.

[37] Letter from Andrew Chronister to the Honorable Timothy J. Savage at 1, 3, ECF No. 71-15 (attached as Ex. K to Def.'s Compassionate Release Mem.) ["Chronister Letter"].

difficulty receiving treatment, citing lockdowns, transfers, and staff availability.[38] Although it has been difficult, Chronister started treatment. He was able to enroll in the "Resolve" program through which he hopes to meet with a psychiatrist on a regular basis.[39] Shortly before he filed this motion, he had his first session with the prison's psychiatrist.[40]

Chronister also cites the COVID-19 pandemic as a reason to reduce his sentence. The COVID-19 virus and its impact on the prison population in a particular case may warrant relief under Section 3582(c)(1)(A).[41] To determine whether extraordinary and compelling reasons exist in an individual case, we consider the circumstances of the COVID-19 pandemic, the defendant's health conditions, the defendant's age, the risk of contracting COVID-19 at the defendant's facility, and whether the defendant has been vaccinated. None of these reasons alone is an extraordinary or compelling reason. Health complications without a risk of COVID-19 at a particular institution do not warrant release. Similarly, the fact that a facility may have confirmed cases of COVID-19 does not justify release if the defendant is not at risk due to age or other medical conditions, or if the defendant is fully vaccinated. However, a combination of these circumstances may rise to the level of "extraordinary and compelling." Hence, each case must be determined by the facts unique to the defendant.

Although Chronister suffers from two medical conditions associated with increased risk of severe illness or death from COVID-19, the risks posed to his health are minimal.

---

[38] *Id.* at 1; Def.'s Compassionate Release Mem. at 20.

[39] Chronister Letter at 1.

[40] Def.'s Compassionate Release Mem. at 20.

[41] *See United States v. Spencer*, 519 F. Supp. 3d 237, 244 (E.D. Pa. 2021); *United States v. Babbitt*, 496 F. Supp. 3d 903, 909 (E.D. Pa. 2020); *United States v. Medina*, No. 15-554, 2021 WL 1581608, at *5 (E.D. Pa. Apr. 22, 2021).

He suffered from asthma in his youth, specifically exercise-induced asthma.[42] But, he acknowledges that he has not recently reported any symptoms.[43] Nor has he engaged in any activities likely to trigger an asthmatic response.[44] His asthma is controlled. Chronister also has a long smoking history. He smoked one to two packs a day from the time he was 15 years old until he was transferred to federal prison in 2017.[45]

On December 22, 2020, although he tested positive for COVID-19,[46] he was asymptomatic and recovered.[47] He has not suffered any residual consequences from his infection.[48] According to his medical records, he refused the Pfizer vaccine on April 6, 2021.[49] Chronister offers a different explanation. He contends that he was not inoculated because he was on a 90-minute legal call with counsel when he was notified of his appointment. Chronister believed he could get the vaccine later, so he deferred to avoid ending his call. On May 6, 2021, Chronister signed up for the next available round of vaccinations.[50] He attached an email from a correctional counselor at FCC Terre Haute, dated May 26, 2021, stating:

> I can confirm that Mr. Chronister was in fact on a legal call on April 6th, 2021 when he was presented with the opportunity to receive a COVID-19 vaccine. I oversee a vast majority of the legal calls for my caseload and medical staff came into my office requesting that he either take the vaccine or sign a

---

[42] Def.'s Compassionate Release Mem. at 21.

[43] *Id.*

[44] *Id.*

[45] *Id.*

[46] BOP Medical R. at 40.

[47] *Id.* at 1–4; Def.'s Compassionate Release Mem. at 20; Govt.'s Suppl. Resp. at 11.

[48] BOP Medical R. at 1–4; Def.'s Compassionate Release Mem. at 20; Govt.'s Suppl. Resp. at 11.

[49] BOP Medical R. at 50.

[50] Def. Andrew Chronister's Reply to the Government's Suppl. Resp. in Opp'n to Def.'s Counseled Mot. to Reduce Sentence Pursuant to 18 U.S.C. § 3582(c)(1)(A)(i) at 11, ECF No. 76 ["Def.'s Reply"].

waiver refusing the shot. Mr. Chronister was concerned that he would have to cut his call short if he chose to receive the shot and therefore signed the form to refuse. I have verified through our Health Services department that Mr. Chronister did in fact sign up to be placed on a waiting list on or about May 6th to receive a COVID-19 vaccination. The date of the next round of vaccines is not yet determined.[51]

In any event, there were no positive cases among the inmate population or the staff members at USP Terre Haute where Chronister is housed.[52] Of the inmates at FCC Terre Haute, 87% are fully vaccinated.[53] Therefore, we conclude these circumstances do not present an extraordinary or compelling reason justifying compassionate release.[54]

---

[51] Email from Tyler Carmichael to Serena Gopal, Subject: Chronister 61867-066, May 26, 2021, ECF No. 76-1 (attached as Ex. U to Def.'s Reply).

[52] Federal Bureau of Prisons, "COVID-19 Coronavirus" (updated daily), https://bit.ly/2SOsQpe.

[53] *Id.*; Federal Bureau of Prisons, "FCI Terre Haute," https://www.bop.gov/locations/institutions/tha/; Federal Bureau of Prisons, "USP Terre Haute," https://www.bop.gov/locations/institutions/thp/.

[54] Our reasoning is consistent with that of numerous other courts in the Third Circuit that have denied compassionate release motions brought by defendants with underlying conditions increasing the risk of severe illness from COVID-19 that were offered but refused vaccination. *See, e.g.*, *United States v. Joseph*, No. 10-664, 2021 WL 5198094, at *3–5 (E.D. Pa. Nov. 9, 2021) ("The Court recognizes that Joseph[, who suffers from diabetes, latent tuberculosis, and obesity,] is within his rights to voluntarily refuse the vaccine; however, Joseph 'cannot then claim that the threat posed by COVID-19 represents an extraordinary and compelling reason warranting his early release.'" (citation omitted)); *United States v. Tommaso*, No. 15-602-2, 2021 WL 4941490, at *4 (E.D. Pa. Oct. 22, 2021) ("Tommaso[, who suffers from hypertension,] is well within his rights to refuse vaccination. However, he cannot then claim that he must be released due to a risk of health complications that could be virtually eliminated by that same vaccine." (citations omitted)); *United States v. Hardison*, No. 18-168, 2021 WL 4132435, at *3 (E.D. Pa. Sept. 10, 2021) ("While Mr. Hardison was, of course, within his rights to make this choice, his argument that he risks death or serious injury from COVID-19 'rings somewhat hollow in light of his affirmative choice to refuse a highly-effective vaccine.'" (citation omitted)); *United States v. Robinson*, No. 15-596, 2021 WL 3537296, at *3 (E.D. Pa. Aug. 11, 2021) ("Accordingly, I find that his refusal to accept a vaccine negates any 'extraordinary and compelling reason' for relief that he would otherwise have, such as his obesity."); *United States v. Kassis*, No. 19-449, 2021 WL 3489816, at *3 (E.D. Pa. Aug. 9, 2021) ("If the Court was to hold that the mere refusal to be vaccinated represents an extraordinary and compelling reason to warrant release, then inmates would be incentivized to refuse vaccinations. This would be contrary to any good sense considerations of the detained individuals' or society's well-being."); *United States v. Adams*, No. 18-502-1, 2021 WL 2822939, at *2 (E.D. Pa. July 7, 2021) ("Under these circumstances, Adams voluntary refusal to 'provide self-care' and mitigate his risk of a severe COVID-19 outcome negates the otherwise compelling medical reason [(obesity)] for his release." (citations omitted)); *United States v. Ortiz*, No. 18-264, 2021 WL 1422816, at *2, *4 (E.D. Pa. Apr. 15, 2021) ("[W]hile a petitioner [with diabetes and obesity] who declines a COVID vaccine is 'within his rights to refuse any treatment he wishes to forego, he cannot simultaneously claim that he must be released because of the risk of complications while refusing a vaccine that could virtually eliminate that risk.'" (citation omitted)); *United States v. Jackson*, No. 07-40-2, 2021 WL 1145903, at *2 (E.D. Pa. Mar. 25, 2021) ("However, Jackson was offered the Moderna COVID-19 vaccine on January 6, 2021 and elected not to be vaccinated[, despite suffering from type II diabetes and obesity].

*Rehabilitation*

Finally, Chronister points to his rehabilitation in prison as an extraordinary and compelling reason warranting his release. An exemplary prison record is not a recognized reason for release. However, it is relevant to the danger to the community and the Section 3553(a) analysis that comes into play only if there is an extraordinary and compelling reason for release.

Chronister's Inmate Education Data Transcript shows he has taken thirty-five educational courses on a variety of topics, including history, women's rights, art, science, and economics.[55] He has had several work assignments while incarcerated. In state prison, he worked in the maintenance repair and the HVAC departments. He has worked as a crossover orderly, showering orderly, and unit orderly. He attached his two most recent performance reviews from March 2021 and April 2021. His March 2021 review states:

> Mr. Chronister has gone above and beyond his expected duties as the unit crossover orderly. He aides [sic] unit management staff by relaying pertinent information regarding the unit and ensures forms are provided to the inmate population within the unit. He can be trusted with organizing supplies and dispersing the proper amounts between the units as needed with without [sic] supervision.[56]

Chronister's April 2021 review states:

> Mr. Chronister has spent countless hours detailing the trim within the offices for the month of April as well as redoing the office floors by stripping them of old wax and applying new

---

Thus it seems that Jackson has voluntarily declined to "provide self-care" and mitigate her risk of a severe COVID-19 infection.").

[55] Andrew Chronister, Inmate Education Data, Transcript, ECF No. 71-13 (attached as Ex. I to Def.'s Compassionate Release Mem.).

[56] Andrew Chronister, Work Performance Rating, March 2021, ECF No. 71-16 at 3–4 (attached as Ex. L to Def.'s Compassionate Release Mem.).

> wax. Mr. Chronister continues to display a great attitude and accepts any job we ask of him without hesitation or complaint and completes the tasks above our expectations.[57]

His March 2021 and April 2021 reviews indicate that his quality of work, quantity of work, initiative, ability to learn, and response to supervision and instruction were outstanding. They also reported that his interest, eagerness to learn, and ability to work with others were good, and that he required no supervision.

Chronister is a remarkably talented artist. He attached three drawings that he completed during his incarcerations, which he gifted to family members.[58]

Chronister has attached three letters from family and friends in support of his rehabilitation efforts and early release. The first is from his adoptive brother, Benjamin Chronister. Benjamin reflected on his brother's self-destructive behavior, noting that his addiction to alcohol and drugs turned him into someone unrecognizable. He expressed that Chronister knows he had a history of extremely bad behavior and that he has worked hard to overcome his addiction. Benjamin writes:

> I feel like with positive and healthy routines and restrictions, he will not allow those bad habits to grow again. We have rebuilt the bridges of trust since then, being in regular correspondence. I've been exchanging a great deal of spiritual guidance with Andrew and I believe he has finally accepted the truth of his situation.
>
> Andrew is a trained mechanic from his time in the Air Force, and had transitioned to a very capable automotive mechanic. If Andrew continues to focus on routine, discipline, faith and hard work, under the values with which he was raised, I

---

[57] Andrew Chronister, Work Performance Rating, April 2021, ECF No. 71-16 at 1–2 (attached as Ex. L to Def.'s Compassionate Release Mem.).

[58] Andrew Chronister's Drawings, ECF No. 71-14 (attached as Ex. J to Def.'s Compassionate Release Mem.).

> believe that he has a great chance to be productive and have a positive effect on society.[59]

The second letter is from his cousin and best friend, Jerri Herbert. She reflected on their childhood together and Chronister's struggles with alcohol, hyperactive behavior, and his temper. She sees herself as a mother figure and has supported him throughout his incarceration. She expressed that he "will be loved and respected but he will also have boundaries and limitations."[60] She promised to "help him to get reacquainted with the massive changes to the outside world"[61] and "to get work and build a better network of support."[62] Herbert also advised that he would have a curfew, account for his time outside the house, and attend church.

The final letter of support is from Michael Vetri, the father of one of Chronister's cellmates. Vetri, a branch manager for a mortgage company, is in the business of buying and upgrading houses. He promised Chronister a job with his home renovation business after his release. Vetri applauded Chronister's character, citing an incident in which he protected his son from a potentially deadly attack from six other inmates. Vetri writes:

> I have always promised Andrew that when God and our judicial system shows him the kindness he deserves and releases him back into our world that he will have a job. I am in the business of buying properties and upgrading them, and Andrew will always have a job as someone who is part of that team, either in a clerical capacity or in a labor capacity. Andrew is very smart, and he used to be an aircraft mechanic in the Air Force. He will succeed in any position because he is skilled and hardworking.

---

[59] Letter from Benjamin Chronister to the Honorable Timothy J. Savage, ECF No. 71-1 (attached as Ex. A to Def.'s Compassionate Release Mem.).

[60] Letter from Jerri Herbert to the Honorable Timothy J. Savage, at 3, ECF No. 71-23 (attached as Ex. S to Def.'s Compassionate Release Mem.).

[61] *Id.* at 3–4.

[62] *Id.*

> Finally, Your Honor, I respectfully ask you to please look at this young man through my eyes and look into your heart with kindness and please send him home to us. Without a doubt he has been rehabilitated. He is a person, a good person, he is not a statistic or a number, he has turned into a good man who is deeply sorry for the things he has done and ready to become a contributing member of society.[63]

In his letter, Chronister explains his significant rehabilitative efforts and the steps he will take to become a productive member of society. He has behaved well and sought to distance himself from people and situations that encouraged his self-destructive behavior. He outlines his relapse prevention plan when he is released. He promises to abstain from alcohol and seek mental health treatment. He has secured employment with Vetri and plans to take courses at a community college or through an online university. He also has a family support system. He plans to live with Herbert, who has agreed to give him the financial, emotional and familial support he needs to succeed upon reentry into society.

We commend his rehabilitative efforts. But, as we have noted, rehabilitation alone is not an extraordinary and compelling reason. 28 U.S.C. § 944(t). If it were, we would certainly grant his motion. Unfortunately, we do not have the discretion to do so.

## Conclusion

We conclude that Chronister has not presented an extraordinary and compelling reason to grant a sentence reduction. Therefore, although we may believe a reduction should be granted in the circumstances of this case, we must deny his motion for a sentence reduction under 18 U.S.C. § 3582(c)(1)(A).

---

[63] Letter from Michael A. Vetri, Sr. to the Honorable Timothy J. Savage, ECF No. 71-24 (attached as Ex. T to Def.'s Compassionate Release Mem.).